# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BUTTE DIVISION

| | |
|---|---|
| COTTONWOOD ENVIRONMENTAL LAW CENTER,<br><br>            Plaintiff,<br><br>     v.<br><br>YELLOWSTONE MOUNTAIN CLUB, LLC,<br><br>            Defendant. | No. CV-23-26-BU-BMM<br><br>**ORDER** |

## INTRODUCTION

Plaintiff Cottonwood Environmental Law Center ("Cottonwood") filed a motion for a preliminary injunction on January 5, 2024. (Doc. 29.) Cottonwood seeks to enjoin Defendant Yellowstone Mountain Club, LLC ("Yellowstone Club") from the following activities: 1) filling the Hole 6 pond and the Hole 12 pond on the Yellowstone Club golf course with reclaimed water; 2) spraying reclaimed water into Second Yellow Mule Creek; and 3) connecting new sewers to Yellowstone Club's wastewater treatment plant. (Doc. 29 at 2.) Cottonwood also asks the Court to sanction Yellowstone Club and Yellowstone Club's counsel for making false representations to the Court. (Doc. 34 at 16.)

1

Yellowstone Club opposes Cottonwood's motion. (Doc. 33.) Yellowstone Club further asks the Court to require Cottonwood to obtain the leave of Court before filing any future motions seeking an injunction or temporary restraining order. (*Id.* at 6.) The Court conducted a motion hearing on February 5, 2024. (Doc. 35.)

## FACTUAL AND LEGAL BACKGROUND

This action concerns Yellowstone Club's alleged pollution of the Gallatin River and its tributaries in southwestern Montana. (Doc. 13 at 2.) Cottonwood claims that the two water hazards on the Yellowstone Club golf course ("Hole 6 pond" and "Hole 12 pond") serve as the point sources of pollution, as Cottonwood alleges that Yellowstone Club fills those ponds with treated wastewater. (*Id.* at 6-9.) Cottonwood asserts that the Hole 6 pond and the Hole 12 pond feed into an unnamed tributary on the Yellowstone Club's golf course ("Unnamed Golf Course Tributary"), and that this Unnamed Golf Course Tributary flows into the South Fork/West Fork of the Gallatin River ("South Fork/West Fork"). (*Id.* at 8.)

Cottonwood next contends that Yellowstone Club overirrigates the Yellowstone Club golf course. Cottonwood argues that Yellowstone Club's overirrigation causes nitrogen pollution to reach the South Fork/West Fork of the Gallatin River ("South Fork/West Fork"). (*Id.* at 6.) Cottonwood further claims that Yellowstone Club sprays treated sewage off the Yellowstone Club golf course near the Yellowstone Club holding ponds. (*Id.* at 9.) Cottonwood identifies sprinklers as

2

point sources, and claims that Yellowstone Club uses the sprinklers to spray treated sewage that reaches Second Yellow Mule Creek, a tributary of the South Fork/West Fork. (*Id.* at 9.) Cottonwood asserts one claim under the Clean Water Act ("CWA"), 33 U.S.C. § 1311(a), against Yellowstone Club for discharging pollutants, including Nitrite + Nitrate as N, Total Nitrogen, and treated sewage into Second Yellow Mule Creek and the South Fork/West Fork without a National Pollutant Discharge Elimination System ("NPDES") permit. (Doc. 13 at 11-12.)

The Court earlier dismissed, without prejudice, Cottonwood's state law nuisance claims. (Doc. 26.) The Court granted, in part, Yellowstone Club's motion for attorneys' fees, costs, or for a stay of proceedings as that motion related to Yellowstone Club's requested litigation costs associated with the preceding case *Cottonwood Env't Law Ctr., et al., v. Yellowstone Mountain Club*, *LLC, et al.*, No. CV-21-93-BU-BMM, 2022 U.S. Dist. LEXIS 182619 ("*Cottonwood I*"). (*Id.*)

The Court denied, in part, Yellowstone Club's motion for attorneys' fees, costs, or for a stay of proceedings as that motion related to Yellowstone Club seeking attorney's fees. (*Id.*) The Court later denied Yellowstone Club's bill of costs, totaling $1,977.38, on the grounds that the Ninth Circuit has not interpreted litigation costs to include travel expenses for a party's attorneys. (Doc. 31.)

f

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish the following four factors: 1) that they are likely to succeed on the merits; 2) that they are likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in their favor; and 4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

The Ninth Circuit also employs a "sliding scale" approach under which a preliminary injunction may be granted "when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011). The sliding scale approach requires additionally that a plaintiff satisfy all the other *Winter* factors. *Id.* A preliminary injunction proves to be an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter,* 555 U.S. at 22.

## DISCUSSION

Cottonwood contends that Yellowstone Club discharges treated wastewater into the South Fork/West Fork and into Second Yellow Mule Creek, and that the discharge causes irreparable harm to the environment. (Doc. 30 at 10–13.) Cottonwood presents a report from its expert, Dr. Patricia M. Glibert ("Dr. Glibert"), discussing nitrogen sampling and algae analysis as evidence of its likelihood of success on its CWA claim. (*Id.* at 10.) Yellowstone Club counters that the activity

4

of which Cottonwood complains is not occurring. (Doc. 33 at 12–14.) Yellowstone Club further argues that requiring Yellowstone Club to stop using reclaimed wastewater could result in its wastewater storage pond overflowing, potentially causing the exact harm of which Cottonwood complains. (*Id.* at 18.)

The Court will discuss first Cottonwood's motion for a preliminary injunction. The Court will then consider Yellowstone Club's request that the Court enter a prefiling order prohibiting Cottonwood from filing future motions for a preliminary injunction or temporary restraining order without seeking leave of the Court. The Court lastly will analyze Cottonwood's motion for sanctions on Yellowstone Club and Yellowstone Club's counsel.

## I. Cottonwood's motion for a preliminary injunction.

Cottonwood claims that Yellowstone Club violates the CWA in two distinct ways: 1) the Hole 6 pond and the Hole 12 pond feed treated sewage into an unnamed tributary and subsequently into the South Fork/West Fork; and 2) the sprinklers spray treated sewage into Second Yellow Mule Creek, a tributary of the South Fork/West Fork. (Doc. 13 at 6-9.)

**A. Whether Cottonwood has demonstrated likely success on the merits or serious questions going to the merits.**

Under *Winter*, likely success on the merits represents the "most important" factor. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). To prevail on a direct discharge claim, a plaintiff must show that "the defendant (1) discharged, i.e.,

5

added (2) a pollutant (3) to navigable waters (4) from (5) a point source." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1083 (9th Cir. 2019). Point source means "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, [or] well . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Pollutant includes "dredged spoil, solid waste, . . . sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, . . . and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). The Court will consider the alleged point sources independently with respect to Cottonwood's likelihood of success on the merits.

### 1. The Hole 6 pond and the Hole 12 pond.

Cottonwood contends that it stands likely to succeed on the merits of its CWA claim. (Doc. 30 at 8.) Cottonwood claims that Yellowstone Club fills the Hole 6 pond and the Hole 12 pond with treated sewage that drains into the South Fork/West Fork. (*Id.* at 9.) Cottonwood cites to water sampling taken from the South Fork/West Fork that it claims demonstrates a substantial concentration of nitrogen pollution. (*Id.*) Cottonwood claims that this water sampling demonstrates that Yellowstone Club's Hole 6 pond and Hole 12 pond discharge treated sewage into a water of the United States. (*Id.*) Cottonwood's argument proves unavailing.

6

A genuine dispute of material fact exists as to whether the Hole 6 pond and the Hole 12 pond contain treated sewage, treated wastewater, reclaimed water, or freshwater. Yellowstone Club submits an affidavit from Rich Chandler ("Chandler"), Vice President of Environmental Operations for the Lone Mountain Land Company. (Doc. 33-1.) Chandler attests that Yellowstone Club does not fill the Hole 12 pond with reclaimed water, and that the Hole 12 pond instead contains freshwater. (*Id.* at 6.) Chandler further notes that the Hole 12 pond and the Hole 6 pond form an artificial, recirculating feature on the Yellowstone Club golf course. (*Id.*) Chandler claims that the freshwater flows down a waterfall feature from the Hole 12 pond, into the Hole 6 pond, and is then pumped back up to the Hole 12 pond. (*Id.*) The water recirculates between the Hole 12 pond and the Hole 6 pond in a perpetual loop. (*Id.*) Chandler alleges that the Hole 6 pond and the Hole 12 pond system does not drain into the South Fork/West Fork. (*Id.*)

Cottonwood claims that a former Yellowstone Club employee contradicts Chandler's statements about the Hole 6 pond and Hole 12 pond containing freshwater. (Doc. 34 at 3.) Cottonwood explains that the former employee refused to sign a sworn statement attesting to this claim out of fear of Yellowstone Club retaliating against his business. (*Id.*) The Court determines Cottonwood's evidence, presented without a declaration attesting to its accuracy and lacking further context, proves unpersuasive until verified. The Court ascribes limited weight to

Cottonwood's rebuttal of Chandler's claims concerning the Hole 6 pond and the Hole 12 pond in evaluating the appropriateness of a preliminary injunction.

The Court further recognizes that the Hole 6 pond and the Hole 12 pond exist approximately 3,500 feet from the confluence of the South Fork/West Fork. (*See* Doc. 33 at 13.) Satellite imaging appears to depict a spillway flowing from the Hole 6 pond under a bridge. (*See* Doc. 34 at 4.) Cottonwood alleges that this spillway flows to the South Fork/West Fork. Cottonwood fails to reconcile, however, the short length of the spillway with the spillway's substantial distance from the South Fork/West Fork. The Court has reviewed the photographs provided by the parties concerning the area in question. The Court can observe no obvious path, connection, spillway, or other conduit between the end of the short spillway of the Hole 6 pond and the South Fork/West Fork. (*See* Doc. 35-3.) Cottonwood further fails to offer evidence that the waterfall feature connecting the Hole 12 pond to the Hole 6 pond serves as a discharge point.

Cottonwood fails generally to connect the water from the Hole 6 pond and the Hole 12 pond to the South Fork/West Fork. Cottonwood cites to the high quantity of nitrogen in South Fork/West Fork water samples taken downstream from Yellowstone Club property. Cottonwood implies that the elevated nitrogen levels result from the Yellowstone Club dumping the treated wastewater contained in the Hole 6 pond and the Hole 12 pond. (*See* Doc. 30 at 9.) Cottonwood attempts to

connect the Unnamed Golf Course Tributary to the Hole 6 pond and the Hole 12 pond. (Doc. 34 at 5.) Cottonwood provides no evidence, however, that the Unnamed Golf Course Tributary stems from, feeds into, or otherwise interacts with the Hole 6 pond or the Hole 12 pond in any way. Cottonwood provides video evidence, allegedly captured on August 30, 2021, that appears to show Cottonwood's counsel taking water samples from the confluence of the Unnamed Golf Course Tributary and the South Fork/West Fork. (*See* Doc. 34-2 at 2); (*see also* Vimeo, "Yellowstone Club Water Sampling (8/30/21)," https://vimeo.com/900032279?share=copy (last visited February 28, 2024.) Cottonwood's video evidence fails to establish how the Hole 6 pond and the Hole 12 pond connect to the Unnamed Golf Course Tributary.

The Court declines to draw the inferences needed to sustain the conclusion that the Hole 6 pond and the Hole 12 pond dump treated sewage or treated wastewater into the South Fork/West Fork of the Gallatin River, absent greater factual support. Cottonwood fails to demonstrate that it is likely to be successful on the merits because Cottonwood has failed to provide sufficient evidence that the Hole 6 pond and the Hole 12 pond constitute point sources discharging pollutants into navigable waters, as required to assert a CWA claim. *See Glaser*, 945 F.3d at 1083. Cottonwood similarly fails to raise serious questions going to the merits of its CWA claim. *See All. for the Wild Rockies*, 632 F.3d at 1134. Cottonwood has not

sufficiently demonstrated that the Hole 6 pond and the Hole 12 pond discharge treated wastewater into the South Fork/West Fork.

### 2. Sprinklers

Cottonwood claims that Yellowstone Club sprays treated sewage into Second Yellow Mule Creek, which is a tributary of the South Fork/West Fork. (Doc. 30 at 9.) Cottonwood asserts that Yellowstone Club's discharge causes and contributes to noxious algae blooms in the South Fork/West Fork. (*Id.* at 10.) Cottonwood's argument proves unavailing.

Chandler, in his affidavit, attests that the sprinklers alleged to be point sources of the sprayed treated sewage sit more than 1000 feet from Second Yellow Mule Creek. (Doc. 33-1 at 7.) Chandler further asserts that these sprinklers have a range of approximately 150 feet. (*Id.* at 7.) Chandler notes that Yellowstone Club employs benches, berms, and other practices to avoid hydraulicly overloading the soil in the area adjacent to the sprinklers to prevent sprinkler runoff from reaching Second Yellow Mule Creek. (*Id.*)

Cottonwood relies on the same unsworn statements of a former Yellowstone Club employee to rebut Chandler's claims. The former Yellowstone club employee allegedly told Cottonwood that the Yellowstone Club sprays treated effluent through the sprinklers, and that the spraying was so heavy that the effluent (treated

wastewater) enters the South Fork/West Fork. (Doc. 34-1 at 2.) The Court gives this unsworn, hearsay statement less weight at this stage of the proceedings.

Cottonwood's argument requires the Court to draw the inference that the elevated nitrogen levels found at the confluence of Second Yellow Mule Creek and the South Fork/West Fork arise from Yellowstone Club allegedly discharging treated sewage into Second Yellow Mule Creek from the sprinklers. (*See* Doc. 34 at 8.) Cottonwood relies primarily on the report of Dr. Glibert. Dr. Glibert opines in pertinent part as follows: "Concentrations [of nitrogen] . . . above second [*sic*] Yellow Mule Creek were 2-3 fold higher than upstream of the golf course tributary." (Doc. 30-1 at 13.) Dr. Glibert concludes that "Yellowstone Club's . . . spraying treated sewage out of its irrigation guns into Second Yellow Mule [Creek] and ultimately South Fork West Fork is causing irreparable harm to the aquatic ecosystem by further degrading the already water-quality impaired waterbody." (*Id.* at 18.)

Dr. Glibert's report contains no indication of how she determined that the treated wastewater enters Second Yellow Mule Creek from the Yellowstone Club sprinkler infrastructure. Dr. Glibert's report instead appears to focus on calculating the nitrogen content of water samples taken from the confluence of Second Yellow Mule Creek and South Fork/West Fork, and further downstream on the South Fork/West Fork. (*See id.* at 3-6, 8-16.) The Court does not doubt the accuracy of the

11

elevated nitrogen levels noted by Dr. Glibert. Dr. Glibert's opinion, presented without evidence concerning how the treated wastewater allegedly flowing from Yellowstone Club's sprinklers enters Second Yellow Mule Creek, proves to be only partially persuasive at this point. Cottonwood's claim that Dr. Glibert "determined the algae samples contain, and are caused by, the Yellowstone Club's treated effluent," lacks factual support from Dr. Glibert's findings and discussion. (Doc. 34 at 8.)

Cottonwood has failed to demonstrate a likelihood of success on the merits as required by *Winter*. 555 U.S. at 22. Cottonwood has presented insufficient evidence to demonstrate that the Yellowstone Club uses the sprinklers to discharge treated wastewater into Second Yellow Mule Creek. No evidence has established that the Yellowstone Club sprinklers spray treated sewage, treated wastewater, or treated effluent into Second Yellow Mule Creek. Cottonwood similarly has failed to raise substantial questions going to the merits of its CWA claim. *All. for the Wild Rockies*, 632 F.3d at 1134. Cottonwood has failed to demonstrate how water flows from the Yellowstone Club's sprinklers, travels more than 1000 feet, and enters Second Yellow Mule Creek.

### B. Whether Cottonwood has demonstrated that irreparable harm is likely to occur in the absence of preliminary relief.

A plaintiff seeking a preliminary injunction must demonstrate that irreparable injury proves likely in the absence of an injunction. *Winter*, 555 U.S. at 22. A party

seeking a preliminary injunction must show a sufficient causal connection between the alleged injury and the conduct sought to be enjoined. *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011). A preliminary injunction may not be granted based only on a possibility of irreparable harm. *Winter*, 555 U.S. at 22. The party moving for a preliminary injunction bears the burden of demonstrating "immediate threatened harm." *Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Establishing a risk of irreparable harm in the indefinite future is not sufficient; the harm alleged must be shown to be imminent. *See Midgett v. Tri-County Metro. Transp. Dist. of Oregon*, 254 F.3d 846, 850-851(9th Cir. 2001).

Cottonwood has failed to meet its burden concerning this factor. Cottonwood claims that Yellowstone Club's unpermitted discharge will "cause[] irreparable harm to the aquatic ecosystem by further degrading the already water-quality impaired waterbody." (Doc. 30 at 12.) The Court recognizes Yellowstone Club's claim that the irrigation season on and around the Yellowstone Club begins in June at the earliest. (Doc. 33 at 16.) Chandler attests, and Cottonwood has failed to dispute, that Yellowstone club irrigates from June to September or early October each year. (Doc. 33-1 at 4.) The Court also recognizes that Cottonwood has failed to provide evidence to rebut Yellowstone Club's contention that it fills the Hole 6 pond and the Hole 12 pond with freshwater instead of treated sewage, treated wastewater, or another form of quality-impaired water. (*Id.* at 15); (*see also* Doc. 33-1 at 6-7.)

The lack of immediacy pertaining to Yellowstone Club's irrigation season, combined with the dispute as to the water content of the Hole 6 pond and the Hole 12 pond, cut against Cottonwood's argument that Yellow Mule Creek and the South Fork/West Fork will suffer immediate irreparable harm. *Caribbean Marine Services Co.*, 844 F.2d at 674. This factor cuts in favor of Yellowstone Club.

### C. Whether the balance of equities tip in Cottonwood's favor.

The party moving for injunctive relief bears the burden of establishing that "the balance of equities tips in [their] favor." *Winter*, 555 U.S. at 22. The Court must "balance the interest and weigh the damage to each [party]" in assessing whether this burden has been met. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009). "Courts must also pay particular attention to the public consequences of employing the extraordinary remedy of injunction." *Native Ecosystems Council v. Mehlhoff*, No. CV 20-19-BLG-SPW-TJC, 2020 WL 3969343, at *7 (D. Mont. July 6, 2020), report and recommendation adopted, No. CV 20-19-BLG-SPW, 2020 WL 4260515 (D. Mont. July 24, 2020) (internal citation and quotation omitted.)

Cottonwood contends that it seeks a narrowly tailored form of preliminary relief. (Doc. 34 at 15-16.) The Court disagrees. Cottonwood seeks a preliminary injunction to prevent the following activities: 1) prevent Yellowstone Club from using treated sewage to fill the Hole 6 pond and the Hole 12 pond; 2) prevent Yellowstone Club from spraying treated sewage into Second Yellow Mule Creek;

and 3) prevent Yellowstone Club from connecting new sewers to the Yellowstone Club's wastewater treatment plant. (Doc. 30 at 3.) The Court construes Cottonwood's prayer for relief as broadly seeking a complete and total pause of the use of the Hole 6 pond and the Hole 12 pond, the irrigation and reforestation project above Second Yellow Mule Creek, and new connections to the Yellowstone Club's wastewater treatment plant.

Cottonwood offers no solution to Yellowstone Club's contention that the granting of Cottonwood's motion to its maximal extent could cause greater environmental harm. (Doc. 33 at 18.) Yellowstone Club cites to the possibility of Yellowstone Club's treated wastewater pond overflowing due to an inability of Yellowstone Club to dispose of treated sewage and wastewater. (*Id.*) The water management situation in the greater Big Sky, Montana area proves complex. The Court recognizes that to grant such a broad injunction may create, in the short term, more water storage, disposal, and management problems than it solves. The Court declines to create the potential for further damage to waterways already under environmental stress based on the insufficient record presented. The Court finds that the balance of equities cuts in favor of Yellowstone Club at this stage.

**D. Whether a preliminary injunction is in the public interest.**

The public interest inquiry generally considers the impact upon nonparties of granting or withholding injunctive relief. *League of Wilderness Defenders/Blue*

*Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). Courts are instructed to "pay particular regard for the public consequences in employ[ing] the extraordinary remedy of injunction." *Stormans, Inc.*, 586 F.3d at 1139 (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312–13 (1982)).

Cottonwood contends broadly that there exists a well-established public interest in preserving nature and avoiding irreparable environmental injury. (Doc. 30 at 16) (citing *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008)). Yellowstone Club counters that its treated wastewater irrigation program arose from a multi-stakeholder process convened by the Gallatin River Task Force known as the Big Sky Sustainable Water Solution Forum. (Doc. 33 at 20) (citing Doc. 33-1 at 8.) The Court determines that the public interest *Winter* factor supports neither party. The existing record demonstrates that the public interest in avoiding alleged environmental injury balances against the need to promote cooperative water use and conservation policies.

Cottonwood has failed to meet its burden for three of the four *Winter* factors. The Court declines to grant Cottonwood's motion for a preliminary injunction.

**II.   Yellowstone Club's prayer for a prefiling order.**

Yellowstone Club asks the Court to impose a prefiling order that would require Cottonwood to obtain leave of the Court before filing any future motions for an injunction or temporary restraining order. (Doc. 33 at 21.) The All Writs Act, 28

U.S.C. § 1651(a), grants district courts the inherent authority to regulate the activities of abusive litigants by imposing pre-filing restrictions. *Ringgold-Lockhart v. County of Los Angeles*, 761 F.3d 1057, 1061 (9th Cir. 2014). The Court recognizes that restricting access to the courts proves to be a serious matter, as "[t]he right of access to the courts is a fundamental right protected by the Constitution." *Id.* (quoting *Delew v. Wagner*, 143 F.3d 1219, 1222 (9th Cir. 1998)). Courts in the District of Montana have noted that pre-filing restrictions represent an extreme remedy that is rarely appropriate. *See Kelly v. Boone Karlberg P.C.*, No. CV 22-174-M-DLC-KLD, 2023 WL 4704441, at *2 (D. Mont. July 24, 2023), report and recommendation adopted sub nom. *Kelly v. Boone Karlberg P.C.*, No. CV 22-174-M-DLC, 2023 WL 7211711 (D. Mont. Nov. 2, 2023).

The Court declines to impose a prefiling restriction on Cottonwood. The Court cautions Cottonwood, however, that repeated motions for preliminary injunctive relief brought without new or additional facts likely will be construed unfavorably.

### III.  Cottonwood's prayer for sanctions.

Cottonwood seeks sanctions against Yellowstone Club and its counsel. (Doc. 34 at 16.) Cottonwood claims that Yellowstone Club had the State of Montana prosecute a Cottonwood employee and contractor for criminal trespass. (*Id.*) Cottonwood argues additionally that Yellowstone Club intimidated a former employee from speaking against Yellowstone Club in this action. (*Id.*)

Cottonwood argues further that Yellowstone Club's counsel, who represents CH SP Acquisition LLC d/b/a Spanish Peaks Mountain Club ("Spanish Peaks") in the action *Cottonwood Envtl. L. Ctr. v. CH SP Acquisition LLC d/b/a Spanish Peaks Mountain Club, et al.*, 2:23-cv-00028-BMM, failed to ensure representations made to the Court were true, made false representations to the Court, and acted in bad faith. (Doc. 34 at 16-17.) Cottonwood seeks sanctions in the form of costs and attorneys' fees for Cottonwood's motion for a preliminary injunction. (*Id.* at 17.)

Section 1927 of Title 28 of the U.S. Code authorizes a court to award costs, expenses, and attorneys' fees against an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." Courts additionally maintain the inherent power to impose sanctions to manage their own affairs and achieve the orderly and expeditious disposition of cases. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). Sanctions pursuant to § 1927 may be sustained under either a finding of bad faith or recklessness. A finding of bad faith proves essential for sanctions imposed under the district court's inherent authority. *See Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010).

The Court declines to impose sanctions on Yellowstone Club's counsel pursuant to 28 U.S.C. § 1927. Cottonwood has not presented sufficient evidence that Yellowstone Club's counsel multiplied the proceedings, either by conduct creating unnecessary proceedings, *Welk v. GMAC Mortg., LLC*, 720 F.3d 736, 738-39 (8th

18

Cir. 2013), or by continuing proceedings after their lack of merit became apparent. *Edwards v. General Motors Corp.*, 153 F.3d 242, 247 (5th Cir. 1998). Cottonwood also has failed to present sufficient evidence that Yellowstone Club's counsel's conduct in this suit rises to the level of vexatious within the meaning of the statute.

The Court declines also to impose sanctions on Yellowstone Club or Yellowstone Club's counsel pursuant to the Court's inherent authority. Before a court may impose sanctions against a party or lawyer pursuant to its inherent power, it must find that the lawyer or party "acted in bad faith, vexatiously, wantonly or for oppressive reasons." *Chambers*, 501 U.S. at 45-46. A finding of bad faith may be warranted where an attorney "knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) (quotation omitted). "The bad faith requirement sets a high threshold [. . .]." (*Id.*)

Cottonwood's allegations fall short of alleging bad faith on the part of Yellowstone Club and Yellowstone Club's counsel. Cottonwood appears to be alleging bad faith stemming from Spanish Peak's counsel (the same person as Yellowstone Club's counsel) in the action *Cottonwood Envtl. L. Ctr. v. CH SP Acquisition LLC d/b/a Spanish Peaks Mountain Club*, *et al.*, 2:23-cv-00028-BMM. The Court advises Cottonwood to keep separate its allegations in this case and in the *Cottonwood v. Spanish Peaks* action. The Court further reminds counsel to avoid

bickering, fingerpointing, and unsubstantiated allegations to enhance their credibility and to promote their effectiveness as professional advocates.

## ORDER

Accordingly, **IT IS ORDERED:**

1. Cottonwood's first motion for a preliminary injunction (Doc. 29) is **DENIED**.

2. Yellowstone Club's request for an order imposing a prefiling restriction (Doc. 33) is **DENIED**.

3. Cottonwood's motion for sanctions (Doc. 34) is **DENIED**.

DATED this 6th day of March 2024.

_____
Brian Morris, Chief District Judge
United States District Court