Ian McIntosh
CROWLEY FLECK, PLLP
1915 South 19th Avenue
P.O. Box 10969
Bozeman, MT 59719
Telephone: (406) 556-1430
imcintosh@crowleyfleck.com

Jonathan W. Rauchway (*pro hac vice*)
Andrea M. Bronson
Michael M. Golz
DAVIS GRAHAM & STUBBS LLP
3400 Walnut Street, Suite 700
Denver, CO 80205
Telephone: (303) 892-9400
jon.rauchway@davisgraham.com
andrea.bronson@davisgraham.com
michael.golz@davisgraham.com

*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| COTTONWOOD ENVIRONMENTAL LAW CENTER, <br><br> *Plaintiff,* <br> v. <br><br> YELLOWSTONE MOUNTAIN CLUB, LLC, <br><br> *Defendant*. | 2:23-cv-00026-BMM <br><br> **YELLOWSTONE MOUNTAIN CLUB'S BRIEF IN SUPPORT OF MOTION TO EXCLUDE CERTAIN OPINIONS OF PATRICIA GLIBERT** |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................1

BACKGROUND ..................................................................................2

I.     Factual Background ..................................................................2

II.    Opinions of Dr. Patricia Glibert ............................................5

     A.     Glibert's Isotope Tracing Opinion .......................6

     B.     Glibert's Chloride Opinion................................11

LEGAL STANDARD.......................................................................15

ARGUMENT ....................................................................................16

I.    Glibert's Isotope Tracing Opinion is unreliable and untestable..................16

II.    Glibert's Chloride Opinion is nonsense. ....................................21

CONCLUSION..................................................................................25

CERTIFICATION OF COMPLIANCE ................................................27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Blain v. Liberty Mut. Fire Ins. Co.*,
No. 22-cv-00970, 2025 U.S. Dist. LEXIS 52900 (S.D. Cal. Mar.
21, 2025) ...........................................................................................................17

*City of Pomona v. SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014) ..............................................................16, 17, 20

*Cooper v. Brown*,
510 F.3d 870 (9th Cir. 2007) ...............................................................................17

*Cottonwood Env't Law Ctr., et al., v. Yellowstone Mountain Club,
LLC, et al.*,
No. 2:21-cv-00093-BU-BMM (D. Mont.) (*Cottonwood I*)................................26

*Daubert v. Merrell Dow Pharms., Inc.*
509 U.S. 579 (1993).............................................................................1, 15, 16, 22

*Mejdrech v. Lockformer Co.*,
No. 01 C 6107, 2003 U.S. Dist. LEXIS 15587 (N.D. Ill. Sept. 4,
2003) ...............................................................................................................18, 23

*United States v. Adams*,
444 F. Supp. 3d 1248 (D. Or. 2020) .....................................................17, 18, 20

*United States v. Bacon*,
979 F.3d 766 (9th Cir. 2020) (en banc) ............................................................15

*United States v. Flores*,
901 F.3d 1150 (9th Cir. 2018) .........................................................................15

*United States v. Grace*,
455 F. Supp. 2d 1148 (D. Mont. 2006).................................................15, 16, 22

**Other Authorities**

Fed. R. Evid. 702 ..............................................................................................*passim*

# EXHIBIT INDEX

Exhibit 1 –    Expert Report of Patricia Glibert (Jan. 1, 2024)

Exhibit 2 –    Expert Report of Patricia Glibert (Dec. 16, 2024)

Exhibit 3 –    Rebuttal Report of Patricia Glibert (Mar. 4, 2025)

Exhibit 4 –    Expert Report of Patricia Glibert (Sept. 23, 2025)

Exhibit 5 –    Excerpts of Deposition of Patricia Glibert (Sept. 12, 2025)

Exhibit 6 –    Expert Report of David Tooke (Dec. 16, 2024)

Exhibit 7 –    Expert Report of Cam Stringer (Dec. 16, 2024)

Exhibit 8 –    Rebuttal Report of David Tooke (Mar. 4, 2025)

Defendant Yellowstone Mountain Club, LLC ("YC") submits this brief in support of its Motion to Exclude Certain Opinions of Patricia Glibert, an expert for Plaintiff Cottonwood Environmental Law Center ("Cottonwood").

## <u>INTRODUCTION</u>

Dr. Patricia Glibert's opinions are junk science.  Under Federal Rule of Evidence 702, an expert witness must use reliable scientific methods and reliably apply them to the facts.  Dr. Glibert did the opposite—she applied her own spin on methodologies that are ill-suited to the facts and have no support in the scientific literature.  The Court should exercise its gatekeeping role under *Daubert v. Merrell Dow Pharmaceuticals*, and prevent her dubious opinions from influencing the jury.

YC seeks to exclude two of Dr. Glibert's many opinions.  First, Dr. Glibert performed a nitrogen isotope tracing analysis and concluded that YC's reclaimed water is impacting every surface water in the vicinity of its property—including its freshwater trout pond and freshwater golf course water hazards.  In applying nitrogen isotope tracing, Dr. Glibert eschewed objective benchmarks in favor of her own subjective analysis.  She did so in an attempt to explain how the wide-ranging data somehow supported Cottonwood's theories of the case.  No reasonable expert in her field could reach the same conclusions.

Second, Dr. Glibert relied on chloride concentrations to calculate the proportion of YC's reclaimed water in the surface waters around YC's property, and

concluded that all locations had significant amounts of reclaimed water. Notably, in Glibert's view, YC's trout pond contains 34% reclaimed water, and a natural groundwater spring on the golf course contains *70% reclaimed water*. There is no basis in the literature for her chloride "methodology," and her conclusions are contradicted by other calculations she performed but did not disclose.

Dr. Glibert's opinions exemplify the danger identified by the Supreme Court in *Daubert*—a litigation expert with a Ph.D. disguising unreliable methods behind esoteric jargon to persuade a jury. In keeping with Rule 702 and *Daubert*, the Court should exclude Dr. Glibert's isotope tracing and chloride opinions from trial.

## BACKGROUND

### I.    Factual Background

YC set forth the factual background of this litigation in connection with its motion for summary judgment. (*See* Docs. 118, 119, and 120.) YC irrigates its 18-hole golf course near Big Sky (the "Golf Course") and a reforestation project south of the Golf Course, known as Crushmore, with reclaimed water. (Doc. 120, ¶¶ 1–2.) YC's reclaimed water comes from its own wastewater treatment plant and from the treatment plant operated by Big Sky County Water & Sewer District No. 363 (the "District"). (*Id.* ¶ 3.) YC stores reclaimed water from those facilities in a lined pond near Crushmore (the "Reclaimed Water Storage Pond" or "RWSP"). (*Id.*)

YC has several freshwater ponds on or near the Golf Course—the Clubhouse Pond, the Hole 6 and 12 Ponds, and the Hole 4 Pond.  (Doc. 120, ¶ 22.)  The Clubhouse Pond is a lined pond.  (*Id.* ¶ 23.)  YC fills the pond with freshwater from its domestic supply wells; YC does not fill the pond with reclaimed water, and there are no pipes that would allow YC to do so.  (*Id.* ¶ 25.)  YC occasionally irrigates the Golf Course with water stored in the Clubhouse Pond.  (*Id.* ¶¶ 23, 26.)  The Clubhouse Pond also serves as a stormwater and snowmelt control feature, and it is stocked with Westslope Cutthroat Trout.  (*Id.* ¶¶ 24, 27.)  In 2024, YC used a bioaugmentation product in the pond, which employs beneficial bacteria (including nitrifiers and denitrifiers) to the water to help break down organic matter, like algae and leaf litter.  (Doc. 120-1 at 11–12 (¶ 19).)

The Hole 4, 6, and 12 Ponds are lined ponds that serve as water hazards on the Golf Course and help YC control stormwater and snowmelt.  (Doc. 120, ¶¶ 28, 32.)  The Hole 4 and 6 Ponds have outlets in case the water level rises too high.  (*Id.* ¶¶ 29, 33.)  The outlets are thousands of feet from the South Fork of the West Fork Gallatin River ("South Fork").  (*Id.* ¶¶ 31, 34.)  As described in YC's summary judgment motion, there are no waters of the United States near the outlets.  (*See* Doc. 119 at 22, 25–27.)

YC is able to fill the Hole 4 Pond and Hole 6 and 12 Ponds with freshwater from the Clubhouse Pond.  (Doc. 120, ¶ 40.)  This process requires the use of manual

valves.  (*Id.*)  However, because these ponds collect rain and snowmelt, YC has not needed to fill them since at least 2015.  (*Id.*)  YC theoretically could fill the Hole 4 Pond and Hole 6 and 12 Ponds with reclaimed water by routing it through the irrigation system and into the ponds using dedicated lateral lines, but it does not and has no reason to do so.  (*See id.* ¶¶ 41, 43–44.)

The Golf Course, Crushmore, the RWSP, and YC's freshwater ponds are depicted on the figure below, along with surface waters in the vicinity: the South Fork, Second Yellow Mule Creek, and the East and Middle Golf Course Tributaries. (*See* Doc. 120-1 at 7.)



Cottonwood asserts five theories for how YC's storage and use of reclaimed water violates the CWA, based on leakage or discharge from YC's ponds and over-irrigation of YC's property.  (Doc. 120-2 at 24 (110:16–19); Doc. 120-3 at 16–19.) YC has moved for summary judgment on all five of Cottonwood's theories.  (Docs. 118, 119, and 120.)

## II.    Opinions of Dr. Patricia Glibert

Cottonwood disclosed Dr. Patricia Glibert as a testifying expert in this case. YC is attaching Dr. Glibert's reports with this brief.[1]

YC seeks to exclude Dr. Glibert's opinions on two topics.  First, Dr. Glibert analyzed nitrogen isotopes in algae and water samples.  Based on this analysis, she concluded that YC's reclaimed water is impacting the East Golf Course Tributary, South Fork, and Second Yellow Mule Creek; she also concluded that the Clubhouse Pond, Hole 4 Pond, and Hole 6 and 12 Ponds contain reclaimed water (the "Isotope Tracing Opinion").  (*See, e.g.*, Principal Report at 22–23; Rebuttal Report at 7–8; Preliminary Report at 16.)  Second, Dr. Glibert estimated the proportion of reclaimed water in these surface waters and ponds based on the concentrations of chloride found in these waters, and concluded that each contains significant amounts of

---

[1] *See* Expert Report dated January 1, 2024 ("Preliminary Report"), attached as Exhibit 1; Expert Report dated December 16, 2024 ("Principal Report"), attached as Exhibit 2; Rebuttal Report dated March 4, 2025 ("Rebuttal Report"), attached as Exhibit 3; Expert Report dated September 23, 2025, attached as Exhibit 4.

*YC's Brief in Support of Motion to Exclude Certain Glibert Opinions - 5*

reclaimed water (the "Chloride Opinion"). (Rebuttal Report at 4–5; Dep. of Patricia Glibert dated September 12, 2025 ("Glibert Dep."), excerpts attached as Exhibit 5, at 164:19–167:9.) Dr. Glibert's Isotope Tracing Opinion and Chloride Opinion are described below.

### A.    Glibert's Isotope Tracing Opinion

**Method.** In nature, elements like nitrogen exist in different isotopes. (*See* Expert Report of David Tooke dated December 16, 2024 ("Tooke Report"), attached as Exhibit 6, at 6.) Isotopes are atoms of the same element but with different atomic weights. (*See id.*) Nitrogen predominantly exists in its nitrogen-14 isotope (N-14) but also has a heavier nitrogen-15 isotope (N-15). (*Id.*)

Dr. Glibert's Isotope Tracing Opinion is based on a phenomenon known as isotopic "fractionation." (*See* Principal Report at 10; Glibert Dep. at 41:3–13.) Physical and chemical processes preferentially use up lighter isotopes (e.g., N-14), leaving behind more of the heavier isotopes (e.g., N-15). (*See id.*; Principal Report at 10; Tooke Report at 7.) This increase in the heavier isotope in what is "left behind" is known as "enrichment." (*See* Principal Report at 11; Glibert Dep. at 44:12–22; Tooke Report at 7.)

The physical and chemical processes that can cause nitrogen isotopic fractionation include volatilization and denitrification. (Principal Report at 10–11; Glibert Dep. at 40:14–20; Tooke Report at 7.) Denitrification is the process by which

microbes convert nitrate and nitrite (compounds containing nitrogen) into nitrogen gas that enters the atmosphere. (Principal Report at 10–11; Tooke Report at 7.) Denitrification is a natural biological process that occurs in soils, surface waters, and even digestive systems. (Glibert Dep. at 65:24–67:3; Tooke Report at 8.) It also is a key chemical reaction used in septic systems and wastewater treatment plants to reduce nitrogen concentrations. (Principal Report at 10; Tooke Report at 8.)

Nitrogen isotopic fractionation is sometimes used to identify sources of nitrogen found in the environment. (Principal Report at 11–12.) Water or algae samples are analyzed to determine the ratio of N-15 to N-14 relative to standard conditions (the standard is the ratio of N-15 to N-14 in air). (*Id.* at 9; Tooke Report at 6.) This calculation is expressed as $\delta^{15}N$ (pronounced "del N-15"). (*See id.*) Because the ratio changes very little, studies often report $\delta^{15}N$ multiplied by a factor of 1,000, or "per mil." (*Id.*; Principal Report at 9.) Because physical and chemical processes enrich N-15 and therefore increase $\delta^{15}N$, higher $\delta^{15}N$ values may signal that these processes have occurred. (*See id.* at 10–11; Glibert Dep. at 40:14–20; Tooke Report at 7–8.)

Scientific literature provides typical ranges of $\delta^{15}N$ values associated with different sources. (*See, e.g.*, Principal Report at 12; Tooke Report at 7–8.) For example, typical $\delta^{15}N$ values resulting from processes in natural soil range from about 2 to 8 per mil. (Principal Report at 12; Glibert Dep. at 62:1–3; Tooke Report

at 7.)  Typical $\delta^{15}N$ values resulting from processes in marine environments range from about 5 to 15 per mil. (Glibert Dep. at 62:4–5; Tooke Report at 7.)  The literature reports a wide range for $\delta^{15}N$ in manure and septic waste, from about 10 per mil to over 20 per mil.  (*See, e.g.*, Glibert Dep. at 54:7–24; Tooke Report at 7.)

Application of isotope tracing to identify nitrogen sources faces two serious challenges.  First, typical $\delta^{15}N$ values for different sources overlap.  (Tooke Report at 8; Glibert Dep. at 59:18–21, 63:1–11, 68:25–69:12.)  This problem is captured by a key figure in a seminal paper by Kendall et al. (2008):



(Tooke Report at 7.)  As the Kendall figure indicates, $\delta^{15}N$ values associated with fertilizer, soil, marine nitrate, manure, and septic waste all overlap.  For example, a $\delta^{15}N$ value of 7 per mil could be associated with chemical processes in soil, marine

environments, animal manure, and human septic systems. (Glibert Dep. at 63:1–11; Tooke Report at 8.)

Second, $\delta^{15}N$ values increase in the environment downstream of nitrogen sources due to natural processes—including denitrification due to natural biological processes. (Principal Report at 10–11; Glibert Dep. at 40:14–20, 45:14–47:9; Tooke Report at 7–8.) Denitrification can result in extreme changes in $\delta^{15}N$ values. For example, a $\delta^{15}N$ value of 5 per mil at a source could increase to as high as 30 per mil in the environment due to natural denitrification. (*See* Glibert Dep. at 80:4–9.) Accordingly, "denitrification can greatly complicate the interpretation of $\delta^{15}N$ values because the exponential increase in $\delta^{15}N$ . . . can sometimes be confused with mixing of [nitrate] sources." (Ex. 5 at 92 (Exhibit 52 to Glibert Dep. at 408).)

**Application.** In August 2024, Cottonwood took algae samples from surface waters on and near YC's property, including the East Golf Course Tributary, South Fork, and Second Yellow Mule Creek. (Principal Report at 16–18.) YC's freshwater ponds were also sampled. (*See id.* at 17.) The samples were analyzed by the Stable Isotope Facility at the University of California, Davis (*id.* at 17), resulting in the following average $\delta^{15}N$ values for certain key sampling locations:

| Sampling Location | Average $\delta^{15}N$ (‰, per mil) |
|---|---|
| Second Yellow Mule Creek, downstream of Crushmore (YC-103) | 5.3 |
| South Fork, downstream of its confluence with Second Yellow Mule Creek (YC-104) | 3.9 |
| Standing water near the Golf Course Tributary confluence with the South Fork (YC-106) | 17.3 |
| South Fork, downstream of the Golf Course Tributary confluence (YC-108) | 14.8 |
| Golf Course Tributary at East Golf Course Road (YC-109) | 10.7 |
| Spring below the Hole 6 Pond and Middle Golf Course Tributary (YC-110) | 3.3 |
| East Golf Course Tributary on the Golf Course (YC-111) | 6.6 |
| South Fork upstream of the Golf Course (YC-112) | 1.5 |
| Hole 4 Pond | 6.1 |
| Hole 6 Pond | 2.2 |
| Hole 12 Pond | 3.1 |
| Clubhouse Pond | 12.5 |
| Reclaimed Water Storage Pond | 17.6 |

Dr. Glibert concluded that the $\delta^{15}N$ values at every location—except for the control sampling locations upstream of YC—demonstrated the presence of YC's reclaimed water in surface waters. (Principal Report at 22–23; *see, e.g.*, Glibert Dep. at 130:17–24 (Second Yellow Mule), 141:22–142:5 (Hole 6 and 12 Ponds); 191:20–22 (Golf Course Tributary).) Many of the $\delta^{15}N$ values fell well below the typical

range associated with wastewater in the literature—including in the East Golf Course Tributary on the Golf Course, Second Yellow Mule Creek, the Hole 4 Pond, and the Hole 6 and 12 Ponds.  Consistent with the literature, Dr. Glibert initially reported that $\delta^{15}N$ values associated with treated effluent typically exceed 10 per mil, but after seeing the data from samples at YC, she adjusted her range down to greater than 7 per mil.  (*Compare* Preliminary Report at 12, *with* Principal Report at 12; *see also* Glibert Dep. at 47:16–50:9.)  Dr. Glibert also explained the discrepancies by claiming that the reclaimed water had been diluted with freshwater at those locations.  (Principal Report at 22, 24; Glibert Dep. at 94:1–20; 130:17–24, 141:6–21; 150:17–151:9, 154:11–14.)  Moreover, the highest $\delta^{15}N$ values were not found on the Golf Course, but rather far downstream of the Golf Course.  Dr. Glibert explained that the increased $\delta^{15}N$ values resulted from denitrification occurring in the environment.  (Glibert Dep. at 154:6–14.)  In other words, regardless of the $\delta^{15}N$ values, Dr. Glibert concluded reclaimed water reached surface waters at every location near or downstream of YC's operations.

## B.    Glibert's Chloride Opinion

**Method.**  Dr. Glibert's Chloride Opinion appeared for the first time in her Rebuttal Report, after YC's expert pointed out the serious defects in isotope tracing at YC's property.  (*Compare* Principal Report, *with* Rebuttal Report at 4–5; *see, e.g.*, Glibert Dep. at 141:22–142:5, 145:10–146:2, 152:14–18.)  In particular, Dr. David

Tooke pointed out the unreliability of relying on nitrogen isotopes to identify nitrogen sources due to overlapping $\delta^{15}N$ values and denitrification occurring in the environment, especially for YC's property, where there are numerous potential sources of nitrogen (including fertilizer and natural marine shales) and natural processes at work. (*See, e.g.*, Tooke Report at 8.)

Chloride is a non-reactive element. (Expert Report of Cam Stringer dated December 16, 2024 ("Stringer Report"), attached as <u>Exhibit 7</u>, at 19; Rebuttal Report at 4; Glibert Dep. at 158:2–7, 158:21–24.) It has numerous sources, including road salt, fertilizers, and stormwater runoff. (Rebuttal Report at 4; Glibert Dep. at 160:2–4, 160:20–161:8.) Chloride also exists in reclaimed water—chloride and sodium are common constituents in influent to wastewater treatment plants, often due to the use of water softeners in households and other facilities. (Stringer Report at 19; *see also* United States Geological Survey, *Methods for Evaluating Potential Sources of Chloride in Surface Waters and Groundwaters of the Conterminous United States*, OFR 2015-1080 (2015) ("USGS Chloride Report"), at 19 ("Water-softening systems also add chloride to the wastewater stream.").)[2] YC's reclaimed water contains chloride and sodium at 225 mg/L and 149 mg/L, respectively, based on August 2024 sampling of the RWSP. (Stringer Report at 15.)

_____

[2] Available at https://pubs.usgs.gov/of/2015/1080/ofr20151080.pdf.

Unlike nitrogen, which transforms in the environment, chloride does not. (Stringer Report at 19; Glibert Dep. at 158:2–7, 158:21–24.)  In his expert report, YC's expert, Cam Stringer, observed that chloride concentrations in the East Golf Course Tributary decreased as it flowed through YC's Golf Course, which was not consistent with Cottonwood's theory that Golf Course irrigation is loading the Tributary with reclaimed water.  (Stringer Report at 21, 24.)  Dr. Glibert latched onto this observation to estimate the proportion of reclaimed water at the sampling locations.  (Rebuttal Report at 4–5.)  Dr. Glibert has never identified any literature supporting her chloride methodology.

**Application.**  YC's consultant collected water samples in May and August of 2024, and analyzed the samples for various constituents, including chloride. (Stringer Report at 15.)  The sampling data are reported in Table 3 of the Stringer Report.  (*See id.*)  Using these data, Dr. Glibert divided the chloride concentration at each sampling location by the chloride concentration in the RWSP on that date. (Rebuttal Report at 5; *see, e.g.*, Glibert Dep. at 164:19–167:1.)  In her view, the resulting proportion is the percentage of diluted reclaimed water in the surface waters at each location.  (Rebuttal Report at 5; Glibert Dep. at 167:2–25.)  The following table summarizes the results of Dr. Glibert's calculations for the August 2024 sampling data and reproduces parts of Table 1 from her Rebuttal Report:

| Sampling Location | Proportion of Reclaimed Water |
|---|---|
| Reclaimed Water Storage Pond | 100% |
| Hole 4 Pond | 16.4% |
| Hole 6 Pond | 20.4% |
| Hole 12 Pond | 20.4% |
| Clubhouse Pond | 34.2% |
| East Spring | 60.4–69.3% |
| East Golf Course Tributary on the Golf Course (YC-111) | 56.4% |
| Golf Course Tributary at East Golf Course Road (YC-109) | 41.8% |
| Spring below Hole 6 Pond and Middle Golf Course Tributary (YC-110) | 17.3% |
| Second Yellow Mule Creek, downstream of Crushmore (YC-103) | 1.8% |
| South Fork, downstream of confluence with Second Yellow Mule (YC-104) | 3.6% |
| South Fork, downstream of Golf Course Tributary confluence (YC-108) | 2.2% |

Based on her analysis, Dr. Glibert concluded that reclaimed water comprised up to 70% of the water flowing out of the East Spring on YC's Golf Course. (Rebuttal Report at 5; Glibert Dep. at 184:10–17.) She also concluded that the Hole 4 Pond was 16.4% reclaimed water, the Hole 6 Pond was 20.4% reclaimed water, and the Clubhouse Pond—a trout pond—was 34.2% reclaimed water. (Rebuttal Report at 5.)

## LEGAL STANDARD

Under Federal Rule of Evidence 702, expert testimony is admissible only if: "(1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. "In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court imposed a gatekeeping obligation on trial judges to engage in objective screening designed to ensure that scientific evidence that is put before the jury 'is not only relevant, but reliable.'" *United States v. Grace*, 455 F. Supp. 2d 1148, 1151 (D. Mont. 2006) (quoting 509 U.S. 579, 589 (1993)). Adherence to Rule 702 and *Daubert* "protect[s] juries from being swayed by dubious scientific testimony." *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018) (citation omitted). Failure to exclude expert testimony that does not meet the requirements of Rule 702 may be grounds for a new trial. *See United States v. Bacon*, 979 F.3d 766, 770 (9th Cir. 2020) (en banc).

The Supreme Court has provided four non-exhaustive factors for trial courts to consider in evaluating reliability: (1) "whether a theory or technique can be tested"; (2) "whether it has been subjected to peer review and publication"; (3) "the known or potential error rate of the theory or technique"; and (4) "whether the theory or technique enjoys general acceptance within the relevant scientific community." *Grace*, 455 F. Supp. 2d at 1152 (citing *Daubert*, 509 U.S. at 593–94).

# ARGUMENT

## I.    Glibert's Isotope Tracing Opinion is unreliable and untestable.

The Court should exclude Dr. Glibert's Isotope Tracing Opinion because she failed to reliably apply the nitrogen isotope tracing methodology to the facts of this case.  Fed. R. Evid. 702(d).  The methodology has two key limitations.  First, $\delta^{15}N$ values for different nitrogen sources overlap significantly.  (Tooke Report at 8; Glibert Dep. at 59:18–21, 63:1–11, 68:25–69:12.)  The scientific literature warns that "in the absence of a comprehensive source inventory . . . the $\delta^{15}N$ technique will typically be ineffective for source identification."  (Ex. 5 at 140 (Exhibit 53 to Glibert Dep. at 424).)  Second, $\delta^{15}N$ values change in the environment downstream of sources—sometimes exponentially.  (Ex. 5 at 92 (Exhibit 52 to Glibert Dep. at 408).)  Instead of navigating these limitations with careful site investigation and analysis, Dr. Glibert abandoned objective benchmarks and applied her own subjective interpretive technique.  This is not reliable science.

The *Daubert* factor regarding "testability"—"whether a theory or technique can be tested"—is informative.  *Grace*, 455 F. Supp. 2d at 1152 (citing *Daubert*, 509 U.S. at 593–94).  For an expert's technique to be reliable, "there must be evidence in the record indicating the methodology 'can be or has been tested.'"  *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1046 (9th Cir. 2014) (quoting *Cooper v. Brown*, 510 F.3d 870, 880–81 (9th Cir. 2007).  "The question is whether an expert's

methodology can be 'challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability.'" *Id.* (quoting Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments). A technique without "meaningful benchmark[s]" is nothing more than an unverifiable black box. *United States v. Adams*, 444 F. Supp. 3d 1248, 1261 (D. Or. 2020); *see also Blain v. Liberty Mut. Fire Ins. Co.*, No. 22-cv-00970, 2025 U.S. Dist. LEXIS 52900, at *20–22 (S.D. Cal. Mar. 21, 2025).

In *Adams*, the district court was faced with expert opinion regarding whether shell casings found at a crime scene had been fired by a particular firearm. 444 F. Supp. 3d at 1252. The expert employed a well-recognized methodology from the Association of Firearm and Toolmark Experts that involved determining whether there was "sufficient agreement" between casings from the crime scene and test-fired casings in a lab. *See id.* at 1252–53. The method involves a degree of art and subjectivity, and the expert "could not articulate an objective means by which to determine whether the shells matched the firearm." *Id.* at 1255.

The district court applied *Daubert* and excluded the expert's opinion. The court observed that, facially, the method appeared to pass muster under the *Daubert* factors—it was an accepted method discussed in many published papers. *See id.* at 1258. But the court concluded that the method as applied was unreliable because there were no "objective standards or benchmarks" against which to test the expert's

technique. *Id.* at 1260. The expert merely was "applying his training and experience to make a subjective conclusion," and his method could not be explained "in a way that would allow an uninitiated person to perform the same test in the same way that [he] did." *Id.* at 1263–64.

Dr. Glibert's application of nitrogen isotope tracing must be excluded for the same reason—because her opinion is purely subjective. As an initial matter, the scientific literature regarding nitrogen isotope tracing does have some benchmarks. Notably, typical $\delta^{15}N$ values associated with human waste range from 10 to 20 per mil. (*See, e.g.*, Glibert Dep. at 54:7–24.) Dr. Glibert acknowledged as much in her preliminary analysis, but after seeing the data from 2024 sampling at YC, she adjusted her range downward to 7 per mil—a value she believes reflects nitrogen processing "at either the sewage treatment facility or downstream thereof." (Preliminary Report at 12; *compare id.*, *with* Principal Report at 12; *see also* Glibert Dep. at 47:16–50:9.) By the end of her report, Dr. Glibert was concluding, without explanation or citation, that a $\delta^{15}N$ value of 6.5 per mil was "highly enriched" and "[m]ore likely than not . . . came from reclaimed irrigation water." (Principal Report at 22.) Her decision to abandon benchmarks in the literature in favor of her own unsupported technique disqualifies her Isotope Tracing Opinion. *See, e.g.*, *Mejdrech v. Lockformer Co.*, No. 01 C 6107, 2003 U.S. Dist. LEXIS 15587, at *10 (N.D. Ill.

Sept. 4, 2003) (excluding expert testimony regarding isotope analysis where the method was an "unprecedented variation on a peer-reviewed procedure").

But moving the goalpost for what $\delta^{15}N$ values reflect treated effluent was not enough. In order to explain the wide-ranging data—which often fell below any of Dr. Glibert's offered ranges for treated effluent—Dr. Glibert improvised. She layered on theories for how some combination of denitrification and dilution of reclaimed water with freshwater was resulting in the observed $\delta^{15}N$ values. (*See, e.g.*, Principal Report at 22, 24 (dilution); Glibert Dep. at 94:1–20; 130:17–24, 141:6–21; 150:17–151:9, 154:11–14 (dilution); *id.* at 154:6–14 (denitrification).) She did not quantify denitrification, or even confirm it was occurring. She also did not make any attempt to inventory other potential sources of elevated $\delta^{15}N$ values— she simply measured $\delta^{15}N$ in the RWSP and asserted that every $\delta^{15}N$ value in the environment around YC was somehow a reflection of the reclaimed water.[3]

Dr. Glibert's approach allows *any* $\delta^{15}N$ value to reflect a reclaimed water signature. Thus, sites with only a "moderate $\delta^{15}N$ signature (5.2 and 3.9,

---

[3] Dr. Glibert's failure to inventory sources of elevated $\delta^{15}N$ values is especially concerning because she acknowledges that other sources exist. For example, the Golf Course is underlain by ancient marine sediment (called Thermopolis shale) that can produce elevated $\delta^{15}N$ values. (Glibert Dep. at 74:1–75:14, 62:4–5; *see also* Rebuttal Report of David Tooke dated March 4, 2025 ("Tooke Rebuttal Report"), attached as <u>Exhibit 8</u>, at 7–8.) She also agrees that natural soils and biological activity in surface waters and freshwater ponds—like YC's water hazards—can produce elevated $\delta^{15}N$ values. (Glibert Dep. at 62:1–3 (soils), 155:3–6 (biological activity in freshwater ponds).)

respectively)" were now "suggestive [of] some fraction of surface water as irrigation water," as the water "would have been diluted . . . ." (Principal Report at 22.) And even sites with $\delta^{15}N$ values as low as 2.2 per mil (the Hole 6 Pond) reflected reclaimed water. (*Id.* at 19; Glibert Dep. at 141:22–142:5.) As a result, her Isotope Tracing Opinion is nothing more than a subjective attempt to explain how wide-ranging data all point to impacts from YC's reclaimed water. It is the quintessential black box— "someone cloaked in the powerful robe of science tell[ing] a jury [s]he knows something, and the reason why amounts to 'trust me, I'm a scientist.'" *Adams*, 444 F. Supp. 3d at 1259.[4]

The Court must focus on Dr. Glibert's application of the method, not the soundness of her conclusions. *City of Pomona*, 750 F.3d at 1040. Her conclusions, however, illustrate the unreliability of her Isotope Tracing Opinion. Early in the case, Dr. Glibert issued an expert report interpreting isotope data from 2023. (*See generally* Preliminary Report.) She reported an average $\delta^{15}N$ value of 3.49 upstream of the Golf Course (*id.* at 14), and concluded that the result had a minimal wastewater signal (Glibert Dep. at 38:1–14). Later, based on the 2024 data, she concluded that a $\delta^{15}N$ value of 2.2 in the Hole 6 Pond was consistent with significant reclaimed

---

[4] YC is not arguing that the nitrogen isotope tracing methodology is *per se* unreliable, *see, e.g.*, *City of Pomona*, 750 F.3d at 1044–45, but rather that Dr. Glibert unreliably applied the methodology to the facts of this case, including by abandoning objective benchmarks in the literature and inventing her own interpretive technique.

water in the pond. (Principal Report at 23; Glibert Dep. at 141:12–21.) In the same breath, she concluded that a $\delta^{15}N$ value of 1.5—from an area upstream of YC's property—is characteristic of rainwater. (Principal Report at 22.) Moreover, none of the surface water samples taken closest to YC's operations exceeded her own 7 per mil value for reclaimed water, yet she concluded all the locations had been impacted by YC's reclaimed water. The reality is that Dr. Glibert assumed YC's operations were impacting surface waters in the vicinity and bootstrapped an interpretation of the data to fit that mold. But there is no rhyme or reason to her method. The Court should exclude Dr. Glibert from testifying about her Isotope Tracing Opinion at trial.

## II.    Glibert's Chloride Opinion is nonsense.

Dr. Glibert's Chloride Opinion is even more unreliable. As explained above, YC's expert, Mr. Stringer, observed that chloride is a non-reactive element that exists in YC's reclaimed water—mainly due to the use of water softeners in Big Sky. (*See, e.g.*, Stringer Report at 19.) He concluded that chloride concentrations in surface waters on the Golf Course were not consistent with impacts from reclaimed water. (*See id.*) After Dr. Tooke, another of YC's experts, pointed out the flaws in Dr. Glibert's Isotope Tracing Opinion, she developed her Chloride Opinion in an attempt to bolster her isotope conclusions. (*Compare* Principal Report, *with* Rebuttal Report at 4–5; *see, e.g.*, Glibert Dep. at 141:22–142:5, 145:10–146:2, 152:14–18.) Dr.

Glibert's Chloride Opinion is unreliable on its face and must be excluded for two reasons.

First, the Chloride Opinion is not the "product of reliable principles and methods." Fed. R. Evid. 702(c). To form her Chloride Opinion, Dr. Glibert simply divided chloride concentrations in the environment by the chloride concentration in the Reclaimed Water Storage Pond. (Rebuttal Report at 5.) Dr. Glibert has never identified any peer-reviewed literature or studies that have employed her methodology. Her chloride methodology—if it can even be called a "methodology"—has not been "subjected to peer review and publication" and does not "enjoy[] general acceptance within the relevant scientific community." *Grace*, 455 F. Supp. 2d at 1152 (citing *Daubert*, 509 U.S. at 593–94).

Nor would it ever be accepted, because it is unscientific and absurd. Chloride is ubiquitous in the environment and is found in nearly all surface and groundwaters. (USGS Chloride Report at 1 ("Chloride exists as a major ion in most natural waters.").) Moreover, there are numerous anthropogenic sources of chloride, including deicing salts (road salts), which "commonly are identified as the primary driver" for increased chloride concentrations in the environment. (*Id.* at 2.) But Dr. Glibert just assumed that any chloride came from YC's reclaimed water—she did not account for other sources, even though it is undisputed that other sources, such as deicer and fertilizer, exist on YC's property. (*See, e.g.*, Doc. 120-1, ¶ 32; Doc.

120-5 at 7 (79:24–80:1).)  Without a source inventory, Glibert's "methodology" could be applied in any setting without any guardrails or justification.  One could measure chloride concentration in a bathtub, a drinking water well, or the river itself and conclude they contain some percentage of YC's reclaimed water.  Her conclusions therefore also are not "based on sufficient facts" and do not reflect "a reliable application of the . . . methods to the facts of the case."  Fed. R. Evid. 702(b), (c).

Finally, Dr. Glibert's Chloride Opinion is contradicted by other calculations she chose not to disclose.  *See Mejdrech*, 2003 U.S. Dist. LEXIS 15587, at *7–8 (observing that expert's isotope analysis was unreliable because it was contradicted by conflicting results).  Cottonwood disclosed an Excel workbook from Dr. Glibert's file in which she estimated the proportion of reclaimed water at the sampling locations based on multiple constituents, including chloride, sodium, total dissolved solids, sulfate, and calcium.  (Glibert Dep. at 179:9–180:17.)  Dr. Glibert reported the proportion of reclaimed water at the sampling locations based on chloride alone (Rebuttal Report at 5), and ignored the results for the other constituents.  For example, she concluded that the East Spring (1B) was approximately 70% reclaimed water based on chloride concentrations.  Using the same concentration "methodology" as her Chloride Opinion, that proportion drops to 12% when based

on sodium.[5]  (Ex. 5 at 143 (Excerpt of Exhibit 59 to Glibert Dep.).)  When her "methodology" is applied to calcium concentrations—an analysis that Dr. Glibert performed but did not disclose, (*See* Glibert Dep. at 185:6)—the results indicate that East Spring (1B) has *more than 100%* reclaimed water in it.  (*See* Stringer Report at 15.)  Other contradictions abound.  Her workbook indicated that the ratio of sodium to chloride in the RWSP was approximately 0.66, whereas the same ratio was only 0.12 in East Spring (1B).  (Ex. 5 at 143 (Excerpt of Exhibit 59 to Glibert Dep.).)  Dr. Glibert scrapped those other analyses and decided—without any justification whatsoever—that chloride was the only valid tracer.  (*See, e.g.*, Rebuttal Report at 4–5.)  That is advocacy, not science.

The absurd results of Dr. Glibert's Chloride Opinion underscore its unreliability.  She concluded that the Clubhouse Pond contained 34.2% reclaimed water (*id.* at 5)—despite the facts that the pond is stocked with Westslope Cutthroat Trout and that it is physically impossible for YC to pipe reclaimed water into that pond. (Doc. 120, ¶¶ 25, 27.)  Dr. Glibert also concluded that the East Spring contains up to *70% reclaimed water*—despite the fact that the East Spring is a natural groundwater feature depicted on maps that predate YC's irrigation.  (*See, e.g.*, Doc. 120-1 at 58 (2001 map depicting East Spring).)

---

[5] Sodium is slightly more reactive than chloride, but it still can serve as a tracer. (*See* Glibert Dep. at 187:14–19.)

Dr. Glibert's Chloride Opinion also is contradicted by her own Isotope Tracing Opinion. For example, she concludes that the Hole 6 Pond contains 20.4% reclaimed water based on chloride, but the pond had one of the lowest $\delta^{15}N$ values sampled: 2.2 per mil, just a touch above the $\delta^{15}N$ of 1.5 per mil that Dr. Glibert attributed to rainwater. (*Compare* Rebuttal Report at 5, *with* Principal Report at 19, 22.) Similarly, she concluded that the East Golf Course Tributary on the Golf Course was 56% reclaimed water with a $\delta^{15}N$ of 6.6 per mil, yet Second Yellow Mule Creek would be only 1.8% reclaimed water based on chloride, with a $\delta^{15}N$ of 5.2 per mil. (*Compare* Rebuttal Report at 5, *with* Principal Report at 19, 22.) There is no scientific basis for these conflicting conclusions.

This case will be tried to a jury. If the Court declines to exercise its gatekeeping function, Dr. Glibert will testify that YC is polluting every surface water in the vicinity to an outlandish degree based on her very technical-sounding Isotope Tracing and Chloride Opinions. But her opinions are based on unreliable speculation and made-up methodologies. There is a real and serious risk that the jury will be swayed by her credentials and esoteric jargon. This is exactly the outcome that Rule 702 and *Daubert* are designed to prevent.

## CONCLUSION

For the foregoing reasons, YC respectfully requests that the Court exclude Dr. Glibert's testimony related to her Isotope Tracing and Chloride Opinions.

DATED this 13th day of October, 2025.

CROWLEY FLECK PLLP

*/s/ Ian McIntosh*
Ian McIntosh

DAVIS GRAHAM & STUBBS LLP

*/s/ Jonathan W. Rauchway*
Jonathan W. Rauchway

*Attorneys for Defendant Yellowstone
Mountain Club, LLC*

## <u>CERTIFICATION OF COMPLIANCE</u>

The undersigned certifies that the foregoing document complies with Local Rule 7.1(d)(2). The Brief contains 5,782 words, excluding the caption, certificate of compliance, and certificate of service. The undersigned relied on the word count of the word-processing system used to prepare the brief.

*/s/ Beatriz Esparza*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document was served upon the following counsel of record by the means designated below on this 13th day of October, 2025.

[ ]  U.S. Mail            John Meyer
[ ]  FedEx               Cottonwood Environmental Law Center
[ ]  Hand-Delivery      P.O. Box 412
[ ]  Facsimile          Bozeman, MT 59771
[X]  ECF                john@cottonwoodlaw.org
[ ]  Email

*Attorneys for Plaintiff*

*/s/ Beatriz Esparza*