# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BUTTE DIVISION

|  |  |
|---|---|
| COTTONWOOD ENVIRONMENTAL LAW CENTER, | CV-23-26-BU-BMM |
| Plaintiff, | |
| v. | **ORDER** |
| YELLOWSTONE MOUNTAIN CLUB, LLC, | **on Summary Judgment** |
| | **and Motions to Exclude Experts** |
| Defendants. | |

Defendant Yellowstone Mountain Club, LLC ("Yellowstone") filed a motion for summary judgment. (Doc. 118.) Yellowstone also filed a motion to exclude certain testimony and opinions of Plaintiff Cottonwood Environmental Law Center's ("Cottonwood") expert witness Patricia Glibert. (Doc. 121.) Yellowstone separately filed a motion to exclude expert testimony of Cottonwood's expert witnesses Tim Covino and Fred Offenkrantz. (Doc. 123.) Cottonwood opposes the motions. (Docs. 125, 126, and 127.) The Court held a hearing on December 8, 2025. (Doc. 135.)

## BACKGROUND

The Court will not repeat at length the factual and procedural background.

This case relates to a Clean Water Act ("CWA") lawsuit filed by Cottonwood

1

against the Yellowstone Club that began in 2022. *See Cottonwood Env't L. Ctr. v. Yellowstone Mountain Club, LLC*, 2023 WL 7018748 (D. Mont. Oct. 25, 2023). Trial is set for February 3, 2026.

## DISCUSSION

### I.    Cottonwood's Motion for Summary Judgment

Yellowstone asks the Court to enter judgment as a matter of law against Cottonwood. (Doc. 119.) Yellowstone seeks summary judgment on the following issues: (1) that Cottonwood's three direct discharge claims relating to the Reclaimed Water Storage Pond underdrain pipe ("Underdrain Pipe"), the Hole 4 Pond, and the Hole 6 Pond and the Hole 12 Pond, fail as a matter of law; (2) that the Crushmore restoration project remains exempt from the CWA discharge permitting; and (3) that Yellowstone did not over-irrigate the golf course. (Doc. 119 at 2.)

Summary judgment proves appropriate when the movant demonstrates "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact requires sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*. at 248.

2

As an initial matter, Cottonwood conceded at the hearing that Cottonwood's "claims are direct discharge" by Yellowstone. (Doc. 139 at 3:23-4:1-2.) Cottonwood informed the Court it will not be pursuing claims of indirect discharge by Yellowstone. (*Id.*) Cottonwood further informed the Court that it will not be pursuing any claims related to the Underdrain Pipe located on the Yellowstone Golf Course. (*Id.* at 3:13-21.) The Court must dismiss Cottonwood's indirect discharge claims and claims related to the Underdrain Pipe based on these concessions. The Court grants Yellowstone's motion for summary judgment on the claims related to the Underdrain Pipe and indirect discharge. The Court will address Yellowstone's motion for summary judgment on the remaining claims.

### A.    Cottonwood's Remaining Direct Discharge Claims

Cottonwood claims direct discharges from two separate locations around Yellowstone's golf course.

### 1.    Hole 4 Pond

Yellowstone argues that Cottonwood failed to include a claim in its complaint that Yellowstone violated the CWA by directly discharging treated effluent from the Hole 4 pond. (Doc. 119 at 6-7.) The Court previously denied Cottonwood's request to amend the complaint to include a direct discharge claim for the Hole 4 Pond. (*See* Doc. 104 at 7-9.) The Court declines to reconsider

allowing Cottonwood to assert untimely a direct discharge claim for the Hole 4 Pond.

"It is fundamental that a plaintiff may not obtain relief on the basis of factual allegations not set forth in the complaint." *Law v. Kinross Gold U.S.A., Inc.*, No. 3:12-CV-00261, 2014 U.S. Dist. LEXIS 54116, at *22 (D. Nev. Apr. 18, 2014), *aff'd*, 651 F. App'x 645 (9th Cir. 2016). "Summary judgment is not 'a procedural second chance to flesh out inadequate pleadings.'" *Hartzell v. Marana Unified Sch. Dist.*, 130 F.4th 722, 745 (9th Cir. 2025) (citation omitted). Cottonwood's failure to plead a claim for direct discharge of the Hole 4 Pond precludes this claim at the summary judgment stage. The Court grants Yellowstone's motion to dismiss Cottonwood's CWA direct discharge claims relating to the Hole 4 Pond.

## 2. The Hole 6 Pond and the Hole 12 Pond

Cottonwood alleges a direct discharge theory that the Hole 6 Pond and the Hole 12 Pond directly discharge reclaimed water into an unnamed stream. Cottonwood contends that this unnamed stream flows into "Unnamed Tributary #2" of the South Fork of the Gallatin River. (Doc. 119 at 26; Doc. 120-3 at 17.) Yellowstone argues, however, that the undisputed facts show that no surface connection exists between the Hole 6 Pond and the Hole 12 Pond and any navigable waters to support Cottonwood's direct discharge claim. (Doc. 119 at 26.)

4

Yellowstone contends that the stream into which Cottonwood alleges Yellowstone discharges pollutants cannot be considered a "navigable water." (*Id.*) The Court disagrees. To prevail on a CWA claims, Cottonwood must prove that Yellowstone engaged in the following conduct: "(1) discharged, i.e., added (2) a pollutant (3) to navigable waters (4) from (5) a point source'" without a permit. *Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1083 (9th Cir. 2019) (quoting *Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993)).

The CWA seeks to prevent persons from discharging pollutants into navigable waters. 33 U.S.C. § 1251(a)(1). The CWA defines "navigable waters" broadly as "waters of the United States, including territorial seas." 33 U.S.C. § 1362(7). "Congress fully intended that the term 'navigable waters' be given the broadest possible constitutional interpretation unencumbered by agency determinations made for administrative purposes." *Martin v. Kan. Bd. of Reagents*, 1991 U.S. Dist. LEXIS 2779, at *13-14 (D. Kan. Feb. 19, 1991) (citing S. Conf. Rep. No. 92-1236, 92d Cong., 2d Sess., reprinted in [1972] U.S. Code Cong. & Ad. News 3668, 3776, 3822).

Courts have further determined that to qualify as a "navigable water" under the CWA, the water must be "relatively permanent, standing, or continuously flowing bodies of water 'forming geographic[al] features' that are described in the

ordinary parlance as 'streams, oceans, rivers, and lakes.'" *Sackett v. EPA*, 598 U.S. 651, 671 (2023) (quoting *Rapanos v. United States*, 547 U.S. 715, 739 (2006)); *see also* 40 C.F.R. § 120.2(a)(3). "[A] [p]ollutant need not reach interstate bodies of water immediately or continuously . . . as long as the tributary would flow into the navigable body [under certain conditions], it is capable of spreading environmental damage and is thus a "water of the United States" under the [CWA]." *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F. 3d 526, 533 (9th Cir. 2001) (quoting *United States v. Eidson*, 108 F. 3d at 1342 (11th Cir. 1997)).

The Hole 6 Pond and the Hole 12 Pond are water hazards located on Yellowstone's golf course. (Doc. 119 at 13.) The water contained in the Hole 6 Pond and the Hole 12 Pond recirculates between the two ponds through a downhill waterfall feature. (*Id.*) A pump returns the water to the upper pond through an underground pipe. (*Id.*) The Hole 6 Pond contains an overflow outlet structure that releases water from the Hole 6 Pond when water levels rise too high during rainfall or snowmelt. (*Id.*) The outlet structure empties into an upland stream, located 3,500 feet from the South Fork of the Gallatin River. (*Id.*)

Yellowstone contends that it fills the Hole 6 Pond and the Hole 12 Pond only with freshwater from the Clubhouse Pond. (*Id.*) Yellowstone asserts that it uses no reclaimed water through the irrigation system to fill the Hole 6 Pond or the Hole 12 Pond. (*Id.*) Yellowstone further argues that the outlet for the Hole 6 Pond

6

and the Hole 12 Pond discharges into an intermittent dry wash. (Doc. 119 at 27.) Yellowstone describes this dry wash as "a nameless upland drainage feature that the Army Corps has determined is not a navigable water." (Doc. 119 at 27.) Cottonwood counters that Yellowstone fills the Hole 6 Pond and the Hole 12 Pond with reclaimed water. (Doc. 127 at 17; Doc. 120-3 at 17.)  Cottonwood further argues that the ponds empty first into an unnamed stream, and then into the "Unnamed Tributary #2" of the South Fork to constitute as reaching "navigable" and "waters of the United States." (Doc. 127 at 17; Doc. 120-3 at 17.)

A genuine issue of material fact remains on whether the Hole 6 Pond and the Hole 12 Pond contain reclaimed water to defeat summary judgment. Yellowstone may continue to argue at trial that it uses no reclaimed water to fill these ponds. The jury properly will resolve the dispute created by Cottonwood's claim that Yellowstone fills the Hole 6 Pond and the Hole 12 Pond with water containing treated effluent. (Doc. 122-3 at 5.)

Congress has defined broadly what qualifies as a "navigable water" under the CWA. The Court finds that conflicting evidence raises a genuine issue of material fact to defeat summary judgment regarding the outlet structure and the waterway into which the Hole 6 Pond and the Hole 12 Pond empty. The parties do not dispute that the Hole 6 Pond, and indirectly the Hole 12 Pond, contains an

7

outlet structure that connects to a dry wash and/or intermittent stream located on the Yellowstone Golf Course.

Cottonwood alleges that the outlet structure flows into a "stream" that connects to the South Fork of the Gallatin River. Cottonwood's expert, Trevor Osorno, opines that the outlet structure for the Hole 6 Pond and the Hole 12 Pond flows into an "ephemeral stream." (Doc. 120-3 at 17 (citing Doc. 13 at 7.)) Osorno further opines that the "ephemeral stream" ultimately flows into Unnamed Tributary #2, a tributary of the South Fork. (*Id.*)

This information plausibly alleges that pollutants contained within the Hole 6 Pond and the Hole 12 Pond could travel and reach the Gallatin River. Cottonwood's claims that the Hole 6 Pond outlet structure, and indirectly the Hole 12 Pond, discharges water containing pollutants that reaches a tributary of the South Fork of the Gallatin River creates a genuine issue of material fact on whether this alleged pollutant discharges to a "navigable water." (*Id.*) Cottonwood provides sufficient evidence to suggest that the Hole 6 Pond and the Hole 12 Pond may discharge pollutants directly into a "navigable water" to survive summary judgment. The Court denies Yellowstone's summary judgment motion relating to Cottonwoods direct discharge claims from the Hole 6 Pond and the Hole 12 Pond. The Court further declines Cottonwood's request to determine as a matter of law,

at this stage, whether the tributaries located on or near the Yellowstone Golf Course constitute "navigable waters."

### B.     Crushmore Claims

The Court next addresses Cottonwood's claims relating to Yellowstone's irrigation of the Crushmore area.

### 1.     The CWA discharge permit exemption for restoration projects

Yellowstone argues that the CWA's exemption on restoration projects bars Cottonwood's claims that its discharges from the 36-acre Crushmore area require a CWA permit. (Doc. 119 at 27-28.) Yellowstone uses reclaimed water for reforestation purposes on the Crushmore area. (Doc. 119 at 30.) The Montana Department of Environmental Quality ("DEQ") acknowledged that "[t]reated wastewater is also utilized for reforestation purposes at [Yellowstone]." (Doc. 120-1 at 153.) Yellowstone began irrigating the Crushmore area reforestation project using reclaimed water in 2018. (Doc. 120 ¶ 48.)

The CWA requires no permit for "discharge[s] from runoff resulting from the conduct of the following silviculture activities conducted in accordance with standard industry practice: . . . reforestation." 33 U.S.C. § 1342(1)(3)(A). To meet the exemption, a party must show the following: (1) the claimed area is a restoration project; (2) the claim asserted relates to the runoff from the restoration project; and (3) the party conducting the restoration project is doing so in

accordance with industry standards. *Id*. No genuine dispute exists that the Crushmore area, located on Yellowstone's property, qualifies as a reforestation project under § 1342. It is further undisputed that Cottonwood's claims directed at the Crushmore area relate to the discharge of runoff.

The Court must determine whether a genuine dispute exists on whether Yellowstone conducts its irrigation of the Crushmore area in compliance with "standard industry practice." Yellowstone contends that it "carefully manages the Crushmore reforestation project" and employs an environmental manager to oversee the Crushmore area reforestation. (Doc. 119 at 31.) Yellowstone claims that it follows standard industry practices and follows the agronomic nitrogen uptake rate and nitrogen-based hydraulic limits set out in DEQ-2. (*Id*.)

Cottonwood counters that genuine issues of material fact remain as to whether Yellowstone's irrigation practices on the Crushmore area conform with standard industry practice. (Doc. 127 at 11.) The Court agrees. Cottonwood takes issue with the amount of reclaimed water Yellowstone uses to irrigate the Crushmore area and the appropriate levels of nitrogen that Yellowstone applies. (Doc. 127 at 11-12.)

Cottonwood also contends that the amount of water that Yellowstone uses to irrigate the Crushmore area exceeds DEQ standards. (Doc. 127 at 14.) Cottonwood's experts opine that Yellowstone's irrigation practices of the

Crushmore area fall outside industry standards. (*Id*. at 11-15.) These disputes
create questions of material fact for the jury to resolve as to whether Yellowstone
conducts its irrigation of the Crushmore "in accordance with standard industry
practice." 33 U.S.C. § 1342(1)(3)(A). The Court declines to determine on summary
judgment whether Yellowstone's irrigation of the Crushmore area falls within the
CWA's permit exemption for reforestation projects.

### 2.    Crushmore area claims

Cottonwood's experts assert two potential discharge pathways for nitrogen
to reach to "navigable waters" from the Crushmore area: (1) irrigation water runs
over the land surface into Second Yellow Mule Creek (Doc. 120-4 at 19 (117:13–
19)); and (2) irrigation water percolates past the roots of the plants on Crushmore,
travels through the groundwater, and emerges in Second Yellow Mule Creek, the
South Fork, and/or the tributaries on the golf course (Doc. 120-4 at 6–7 (41:19–
42:12), 12–13 (90:17–91:12)). (Doc. 119 at 29.)

Cottonwood's second theory of a discharge pathway related to the
Crushmore area represents an indirect discharge claim. Cottonwood has informed
the Court that it no longer pursues any indirect discharge claims against
Yellowstone. (Doc. 139 at 3:23-4:1-2.) The Court grants Yellowstone's motion for
summary judgment on Cottonwood's claim relating to Yellowstone's alleged over-
irrigation of the Crushmore area indirectly discharging pollutants through the

ground water on the Yellowstone golf course. Cottonwood's expert witnesses may not opine at trial on the issue of Yellowstone's alleged over-irrigation of the Crushmore area being the "functional equivalence" of a direct discharge.

Cottonwood's first theory related to the direct discharge pathway of irrigation water from the Crushmore area to the Second Yellow Mule Creek remains. As previously stated by the Court, Cottonwood must present evidence at trial to indicate the direct pathway that the reclaimed water from the Crushmore area travels in reaching the Second Yellow Mule Creek. (*See* Doc. 38 at 11-12.) The Court denies Yellowstone's motion for summary judgment relating to Cottonwood's claims of direct discharges by Yellowstone from the Crushmore area into waters of the United States. Cottonwood remains limited at trial to presenting only a CWA direct discharge claim regarding Yellowstone's irrigation of the Crushmore area.

### C.    Over-irrigation Claims

Cottonwood abandoned its over-irrigation claims of the Yellowstone golf course that create indirect discharges of pollutant into the Gallatin River. (Doc. 139 at 3:23-4:1-2.) The Court grants Yellowstone's motion for summary judgment to the extent that Cottonwood's claims of Yellowstone's over-irrigation of the golf course relate to indirect discharges reaching the Gallatin River.

Cottonwood may continue to pursue its direct discharge claims regarding the sprinklers located on Yellowstone's golf course. Cottonwood's decision to pursue only direct discharge claims limits Cottonwood's ability to present evidence of discharged treated effluent reaching the South Fork/West Fork of the Gallatin River. Cottonwood may present evidence at trial to treated effluent reaching the Gallatin River only through direct surface connections from Yellowstone's golf course. Cottonwood may not present evidence of discharges relating to the alleged over-irrigation of the Yellowstone's golf course that represents the "functional equivalence" of a direct discharge. (*See* Doc. 139 at 3:23-4:1-2.) The Court grants Yellowstone's motion for summary judgment on Cottonwood's indirect discharge claims relating to the over-irrigation of the Yellowstone golf course. Cottonwood's claims remain related to the alleged discharge of treated effluent from sprinklers on Yellowstone's golf course directly into the tributaries of the Gallatin River.

## II.    Motion to Exclude Certain Opinions and Testimony by Patricia Glibert

Yellowstone seeks to exclude two opinions by Cottonwood's expert witness Patricia Glibert. (Doc. 122.) Yellowstone argues that Glibert's analysis of (1) the nitrogen isotopes in the algae and water samples and (2) the chloride concentrations found in the Clubhouse Pond, Hole 4 Pond, and Hole 6 and 12 Ponds prove unreliable, prove untestable, and present nonsense. (*Id*. at 20-27.) The

Court disagrees. Yellowstone's concerns with Glibert's testimony more appropriately can be addressed on cross-examination.

Pursuant to Fed. R. Civ. P. 702, an expert's testimony proves admissible under the following circumstances: "(1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The U.S. Supreme Court "[i]n *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, imposed a gatekeeping obligation on trial judges to engage in objective screening designed to ensure that scientific evidence that is put before the jury 'is not only relevant, but reliable.'" *United States v. Grace*, 455 F. Supp. 2d 1148, 1151 (D. Mont. 2006) (quoting 509 U.S. 579, 589 (1993)). "[J]udges are entitled to broad discretion when discharging their gatekeeping function." *U.S. v. Hankey*, 203 F. 3d 1160, 1168 (9th Cir. 2000).

A court may consider the following factors when determining reliability: (1) "whether a theory or technique can be tested;" (2) "whether it has been subjected to peer review and publication;" (3) "the known or potential error rate of the theory or technique;" and (4) "whether the theory or technique enjoys general acceptance within the relevant scientific community." *Grace*, 455 F. Supp. 2d at 1152 (citing *Daubert*, 509 U.S. at 593–94). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional

and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

### A.    Nitrogen Isotope Analysis Opinion

Yellowstone first contends that Glibert failed to apply her methodology of nitrogen tracing reliably to the facts of this case. (Doc. 122 at 20.) Yellowstone argues that Glibert's nitrogen opinion fails to consider different nitrogen sources downstream of Yellowstone. (*Id.*) Yellowstone further asserts that Glibert inconsistently applied what constitutes suitable nitrogen isotope benchmark values. (*Id.*)

The Court declines to exclude Glibert's nitrogen isotope opinions based on *Daubert*. Glibert's background and experience indicate she has the requisite expertise to opine on certain topics in this case. Glibert performed her nitrogen isotope tracing in accordance with accepted methodology and the literature available. Glibert reached a conclusion that conflicts with the conclusion reached by Yellowstone's experts as to the source of the nitrogen contamination.

Cottonwood asserts that the literature surrounding nitrogen isotope tracing follows no strict cut off value for what constitutes a suitable value for nitrogen (Doc. 125 at 5.) Glibert's report cites and relies on peer-reviewed methodologies, generally accepted by the community, that she followed in forming her analysis of this case. (Doc. 122-1 at 6-17.) "Challenges that go to the weight of the evidence

are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). Yellowstone's concerns with Glibert's alleged inconsistencies and failures to consider other nitrogen sources, beyond Yellowstone's activities on and around its golf course, properly may be addressed on cross-examination.  The jury remains free to decide Glibert's credibility regarding the nitrogen testing after hearing the evidence from both parties.

### B.    Chloride Opinion

Yellowstone also takes issue with Glibert's opinions regarding chloride tracing as unreliable. (Doc. 122 at 25.) Glibert's opinions differ from Yellowstone's experts who concluded that the chloride found in the surface waters on Yellowstone's golf course were not consistent with reclaimed water. (*Id.*) Yellowstone asserts that Glibert's method of calculating the chloride concentration appears flawed as she simply divides the chloride concentration from the environment by the chloride concentration found in the Reclaimed Water Storage Pond. (*Id.* at 26.)

Both parties agree that chloride can be used to assist in determining the source of a pollutant in waters as chloride serves as a "conservative tracer." (Doc. 125 at 6.) Glibert opines regarding the chloride concentrations in the waters around

Yellowstone's golf course based on this generally accepted principle. (*Id.*) Other peer-reviewed literature similarly traces chloride isotopes when determining alleged pollution of waters by treated effluent. (*Id.*) Glibert's reliance and theory for analyzing chloride appears accepted within the scientific community.

Glibert provided further explanation as to why her conclusions differed from Yellowstone's experts. Glibert testified at her deposition that based on her experience and analysis of the data, the chloride found in the waters around Yellowstone's golf course did not result from rock weathering, road salt, rain, or fertilizer. (Doc. 125 at 6.)

Yellowstone points to what it considers contradictory and poorly cited portions of Glibert's deposition testimony and opinions relating to both nitrogen and chloride. Yellowstone's issues with Glibert's calculations of the chloride concentrations can be addressed through cross-examination. Yellowstone may point out the inconsistencies and conflicting results between Glibert's opinion on nitrogen and chloride. The jury remains free to evaluate the credibility of Glibert's opinions. Exclusion of Glibert's opinions based on *Daubert* would be inappropriate. *Daubert*, 509 U.S. at 595.

Yellowstone may cross-examine Glibert regarding these alleged infirmities with her opinions. Yellowstone also retains the opportunity to provide the jury with sufficient rebuttal data to undermine Glibert's testimony at trial, including contrary

17

testimony by its experts. The Court denies Yellowstone's motion to exclude

pursuant to *Daubert* certain opinions and testimony of Glibert.

### III.    Motion to Exclude Testimony of Tim Covino and Fred Offenkrantz

Yellowstone requests the Court to exclude the testimony of Cottonwood's

rebuttal expert witnesses Covino and Offenkrantz. (Doc. 123.) Yellowstone

contends the testimony proves unhelpful, unreliable, cumulative, and improper

rebuttal. Yellowstone claims, in part, that Covino and Offenkrantz undertook no

investigation or research in preparing their own rebuttal reports and instead simply

reviewed the opinions of the parties' disclosed experts.

"[E]xperts may not solely rely on the opinions of other experts." *Exxon

Mobil Corp. v. AECOM Energy & Constr., Inc.*, No. CV 19-107-BLG-SPW, 2024

U.S. Dist. LEXIS 235077, at *8 (D. Mont. Dec. 11, 2024). This prohibition proves

particularly true because "[a]n expert's sole or primary reliance on the opinions of

other experts raises serious reliability questions." *Cholakyan v. Mercedes-Benz

USA, LLC*, 281 F.R.D. 534, 544 (C.D. Cal. 2012) (collecting cases). The court in

*Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 275 (E.D. La 2014),

concluded that "[a]s many courts have recognized, expert testimony based solely

or primarily on opinions of other experts is inherently unreliable." *Id.* An "expert

[must] undertake[] some independent investigation of the underlying opinions" in order to be considered reliable. *Id.* (collecting cases).

The admission of rebuttal expert opinions serves "solely to contradict or rebut evidence on the same subject matter identified by another party" offered through that other party's expert disclosures. Fed. R. Civ. P. 26(a)(2)(D)(ii). "Rebuttal is for the purpose of contradicting an opinion. Rebuttal designations and disclosures are not intended to provide a party with the opportunity to select a more appealing expert, in terms of qualifications, to present the same opinions provided previously by their initial experts." *Krueger v. Wyeth, Inc.*, 2012 U.S. Dist. LEXIS 118987, at *12–13 (S.D. Cal. Aug. 22, 2012).

### A.    Tim Covino

Covino provided a rebuttal expert report in this case. Covino attended one of the site visits to the Yellowstone golf course with Cottonwood in August of 2024. (Doc. 126 at 5.) Covino mainly addresses the topics of isotopic analysis. (*Id*. at 1.) Covino, like Glibert, concluded that the isotope ratios found in the waters around Yellowstone's golf course prove consistent with treated effluent. (*Id*.) Covino provides sufficient reasoning and analysis for why he agrees with Glibert's opinion. (*See* Doc. 124-3 at 3-4.) Covino provides an explanation of the nutrient concentration from the sampling done in this case. (*Id*.)

Covino claims to have reached his conclusions based on his personal observations of Yellowstone's property, the data provided by Yellowstone's experts, the data provided by Cottonwood's expert, and independent application of peer-reviewed literature. The law does not preclude entirely experts from relying on the opinions of other experts. Another expert's opinion cannot form the *sole* or *primary* basis for an expert's opinion. *Exxon Mobil Corp.,* 2024 U.S. Dist. LEXIS 235077, at *8; *Cholakyan*, 281 F.R.D. at 544 (emphasis added). Cottonwood has sufficiently shown that Covino's opinion does not solely rely on the opinions of other expert witnesses. Covino's opinions appear further grounded in his own independent analysis and reasoning.

Yellowstone argues, in the alternative, that Cottonwood improperly disclosed Covino as a rebuttal expert witness. (Doc. 124 at 17-18.) Yellowstone argues that Covino's opinion simply provides a continuation of Cottonwood's claims and arguments and fails to rebut the contentions provided by Yellowstone. (*Id*.) The Court disagrees. Cottonwood points out that Covino makes contrary findings to Yellowstone's experts David Tooke and Cam Stringer. (Doc. 126 at 5-6; 9.) Covino provides some rebuttal evidence not contained within Cottonwood's other reports relating to Yellowstone. Covino further rebutted contentions made by Yellowstone's experts regarding the source of pollutants coming from sources "other than geologic material." (Doc. 124-3 at 4.)

20

Covino testified at his deposition regarding Stringer's opinion on denitrification and other alleged mistakes regarding watershed hydrology and biogeochemistry. "Stringer said that plants incorporate nitrogen through a process of denitrification. That's completely untrue." (Doc. 126-1 at 6.) Covino's opinion appears to properly rebut contentions made by Yellowstone's experts based on Covino's independent analysis. Covino may testify at trial. The Court informs Cottonwood that Covino's testimony must provide additional independent information, not simply statements agreeing with Cottonwood's other expert witnesses, to avoid unneeded repetition. The Court does not find based on the expert witness reports provided that Covino's report simply "parrots" that of Cottonwood's other expert witnesses.

### B.    Fred Offenkrantz

Yellowstone makes similar arguments to support the exclusion of Offenkrantz's testimony at trial. Yellowstone further argues that Offenkrantz lacks the proper qualifications to testify to the types and number of permits that Yellowstone needs to irrigate with reclaimed water. (Doc. 124 at 19.)

Offenkrantz's work at the Montana Department of Natural Resources and Conservation ("DNRC") from 2005 to 2022 did not directly involve permit applications or water quality. (*Id*.) Offenkrantz's role at the DNRC concerned water rights. (*Id*.) Offenkrantz worked as a permit writer with the Montana DEQ

21

from 2000-2002. (*Id*.) Offenkrantz's experience at the DEQ for two years, more than 20 years ago, related to permit renewals. (*Id*.) Offenkrantz's work related to permit renewals did not address whether and when an applicant's facility required a permit. (*Id*.) Offenkrantz's experience at DEQ on permit renewals provides a questionable foundation to opine on an applicant's need for a permit from DEQ in the first instance. Yellowstone properly may address concerns of Offenkrantz's qualifications on cross-examination. Offenkrantz experience and general knowledge of permitting during his time at the DEQ provides indirect support to allow him to opine on Yellowstone's need for a permit to irrigate the Crushmore area and golf course with reclaimed water.

Yellowstone also suggests that Cottonwood improperly disclosed Offenkrantz as a rebuttal expert witness. The Court disagrees. "[P]roper rebuttal testimony should address only new arguments raised by the adverse party that could not have been anticipated previously. Put differently, rebuttal testimony should not be a mere continuation of a party's case-in-chief." *Wenjia Zhai v. Cent. Neb. Orthopedics & Sports Med., P.C.*, No. 4:16-CV-3049, 2017 U.S. Dist. LEXIS 210907, at *5–6 (D. Neb. Dec. 22, 2017) (citations omitted).

Offenkrantz's rebuttal report provides some rebuttal to Yellowstone's contentions. Offenkrantz states, "[t]he Stringer report prepared for [Yellowstone] states that the [Yellowstone] does not need a national pollutant discharge

22

elimination system permit ("NPDES"). After reviewing relevant information, I have determined that statement is incorrect, and [Yellowstone] should have an [Montana National Pollutant Discharge Elimination System] ("MPDES") permit for several discharges occurring across their property." (Doc. 124-5 at 3.) No other Cottonwood expert provides a detailed summary of the permitting process. No other Cottonwood expert opines that Yellowstone's irrigating activities with reclaimed water and alleged discharge of pollutants require a permit. Cottonwood's initial expert disclosure by Trevor Osorno only mentioned that Yellowstone's irrigation with reclaimed water was occurring without a NDPES permit. (Doc. 63-7 at 8.)

Yellowstone's expert, Stringer, opined on the topic of Yellowstone's need for a NPDES permit or MPDES permit in his report. (Doc. 122-7 at 33-34.) Stringer provided details on the typical facilities in his experience that require a permit for discharging effluent. (*Id*. at 33.) Stringer concluded that, as to Yellowstone, "the agronomic uptake of nitrogen combined with the diffuse footprint over which the irrigation is applied, and the design and intent of the facility does not qualify as requiring an NPDES permit." (*Id*. at 34.) Stringer could opine on the topic of permitting, as he worked on many sites that required an NPDES permit that differed from Yellowstone. (*Id*. at 33.) Cottonwood could have foreseen that Yellowstone would have argued its activities did not require a permit.

23

Cottonwood may not have foreseen, however, an argument related to the comparison of other facilities that require a permit to Yellowstone's activities. Offenkrantz's experience of reviewing renewal permits of facilities like those described by Stringer could be relevant. Offenkrantz's rebuttal report contradicts the arguments made by Yellowstone regarding the typical facilities and discharges that require a permit.

The Court determines that Offenkrantz's rebuttal testimony provides more than "mere a continuation of the [Cottonwood's] case in chief." *Wenjia Zhai,* 2017 U.S. Dist. LEXIS 210907, at *5–6. Cottonwood rebutted and contradicted Yellowstone's contentions that a permit was not required with Offenkrantz's rebuttal report. Offenkrantz's testimony provides additional opinions that differ from Cottonwood's other experts, avoiding needless repetition. No other Cottonwood expert witnesses provide opinions on the permitting requirements under the NPDES or MPDES. Offenkrantz's limited opinions on permitting further appear grounded in his own independent analysis and reasoning. The Court denies Yellowstone's motion to exclude the testimony of Offenkrantz.

## ORDER

Accordingly, **IT IS HEREBY ORDERED** that

1.     Yellowstone's Motion for Summary Judgment (Doc. 118) is **DENIED**, in part, and **GRANTED**, in part. Cottonwood's only remaining claims involve the alleged direct discharges from the Hole 6 Pond and the Hole 12 Pond, direct discharges from the sprinklers on the Yellowstone golf course, and direct discharges from Yellowstone's irrigation of the Crushmore area.

2.     Yellowstone's Motion to Exclude Certain Testimony and Opinions of Patricia Glibert (Doc. 121) is **DENIED.**

3.     Yellowstone's Motion to Exclude Testimony of Tim Covino and Fred Offenkrantz (Doc. 123) is **DENIED**.

DATED this 19th day of December 2025.

_____
Brian Morris, Chief District Judge
United States District Court